**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>MANUEL EDWIN MARTINEZ,<br><br>　　　　Defendant. | Case No. 2:22-cr-00135-GMN-NJK<br><br>REPORT AND RECOMMENDATION<br><br>(Docket No. 39) |

This matter was referred to the undersigned Magistrate Judge on Defendant Manuel Edwin Martinez's motion to suppress evidence. Docket No. 39. The Court has considered Defendant's motion and exhibits, the United States' response, Defendant's reply, and the evidence and arguments presented at an evidentiary hearing held before the Court. Docket Nos. 39, 40, 47, 50, 80, 81.

## I.　　BACKGROUND

### A.　Testimony of Officer Falldorf[1]

On January 12, 2022, Las Vegas Metropolitan Police Department ("LVMPD") Officer Zachary Falldorf was assigned to a patrol flex team, which is a reactive law enforcement team in Las Vegas, Nevada. Hearing Tr. (6/20/2024) at 10:07 a.m.[2] Officer Falldorf was in uniform

---

[1]　　Officer Falldorf is now a Detective. Since he was an officer at the time the events in the instant case occurred, however, the Court refers to him herein as Officer Falldorf.

[2]　　Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant date and time of the hearing.

wearing a body camera, driving a marked police vehicle along with his partner, LVMPD Officer Dominic Lee. Hearing Tr. (6/20/2024) at 10:08 a.m. – 10:09 a.m., 10:14 a.m. At approximately 10:40 p.m., the officers, who had just finished up a call and had finished their shift, were at a Chevron gas station at 6176 S. Las Vegas Boulevard in Las Vegas, refilling their vehicle and cleaning it up for the next shift. Hearing Tr. (6/20/2024) at 10:10 a.m., 10:13 a.m., 10:14 a.m., 10:33 a.m. The gas station was located in a heavily populated area. Hearing Tr. (6/20/2024) at 10:11 a.m. Both the Harry Reid International Airport and the Welcome to Las Vegas sign are in the area. Hearing Tr. (6/20/2024) at 10:11 a.m. Many people go to the sign and many incidents occur there. Hearing Tr. (6/20/2024) at 10:11 a.m. Further, gunshots ring out in this area "almost nightly." Hearing Tr. (6/20/2024) at 10:11 a.m.

After the officers had refueled and cleaned their vehicle and were getting ready to leave the gas station, an SUV pulled up next to the officers' vehicle "at a very rapid pace" and locked up the brakes, which caught the officers' attention. Hearing Tr. (6/20/2024) at 10:10 a.m., 10:14 a.m. – 10:15 a.m., 10:33 a.m., 11:27 a.m. The female driver quickly got out of the SUV, "had a scared look on her face" and mouthed the words "I need help" to the officers, who were in their vehicle. Hearing Tr. (6/20/2024) at 10:15 a.m. – 10:16 a.m., 10:34 a.m., 11:25 a.m., 11:27 a.m. The woman went toward Officer Lee, on the passenger side of the vehicle, and he made contact with her. Hearing Tr. (6/20/2024) at 10:16 a.m., 10:34 a.m. – 10:35 a.m. Both officers stepped out of their vehicle. Hearing Tr. (6/20/2024) at 10:16 a.m., 10:35 a.m.

Officer Falldorf, who was on the driver's side of his vehicle, saw Defendant in the front passenger seat of the SUV. Hearing Tr. (6/20/2024) at 10:10 a.m., 10:16 a.m. At that point, Officer Falldorf did not know Defendant's name, whether he had a criminal history, or whether he was armed. Hearing Tr. (6/20/2024) at 11:27 a.m., 11:28 a.m. Officer Falldorf saw that Defendant

2

had an "upset, mad look on his face" and a black satchel in his hand and was rocking back and forth. Hearing Tr. (6/20/2024) at 10:16 a.m. – 10:17 a.m., 11:36 a.m. Officer Falldorf told Defendant to show his hands, but Defendant instead pointed a Baretta pistol directly at Officer Falldorf. Hearing Tr. (6/20/2024) at 10:17 a.m., 10:35 a.m., 11:19 a.m., 11:30 a.m., 11:32 a.m., 11:36 a.m. Officer Falldorf knows for certain that it was a firearm in Defendant's hand at that point. Hearing Tr. (6/20/2024) at 11:36 a.m. Officer Falldorf screamed to his partner, "Get down, he's got a gun" and took cover behind a gas pump. Hearing Tr. (6/20/2024) at 10:17 a.m. – 10:18 a.m., 11:32 a.m. Officer Lee ducked and the female driver of the SUV ran away. Hearing Tr. (6/20/2024) at 10:36 a.m.

As he was retreating, Officer Falldorf heard a muffled gunshot and saw a flash go off inside Defendant's vehicle, which meant to him that Defendant shot a round from the firearm. Hearing Tr. (6/20/2024) at 10:18 a.m., 10:19 a.m., 11:14 a.m., 11:32 a.m. Officer Falldorf then saw Defendant open the door, get out of his vehicle, and point the firearm at Officer Lee as he went toward the officers' vehicle. Hearing Tr. (6/20/2024) at 10:18 a.m. - 10:19 a.m., 10:39 a.m., 11:19 a.m., 11:32 a.m. Officer Falldorf then heard exchanges of gunfire between Defendant and Officer Lee but could not see much from his position of cover behind the gas pump. Hearing Tr. (6/20/2024) at 10:19 a.m., 10:36 a.m. – 10:37 a.m., 10:39 a.m., 11:15 a.m., 11:16 a.m., 11:32 a.m. After the gunfire ended, Officer Falldorf moved to the right and saw Defendant crouched down in between the officers' vehicle and the SUV pointing a gun at him. Hearing Tr. (6/20/2024) at 10:19 a.m., 10:39 a.m., 10:53 a.m., 11:19 a.m. Officer Falldorf shot two rounds at Defendant and Defendant went down to the ground. Hearing Tr. (6/20/2024) at 10:19 a.m., 10:39 a.m. – 10:40 a.m., 10:53 a.m.

3

Officer Falldorf retreated for cover, asked for a "red," or emergency, over the radio, and put out over the radio that Defendant was down.  Hearing Tr. (6/20/2024) at 10:20 a.m., 10:38 a.m., 10:52 a.m. Officer Falldorf then met Officer Lee behind the gas pump where they maintained cover until another patrol car arrived, at which time they took cover behind that vehicle.  Hearing Tr. (6/20/2024) at 10:20 a.m., 10:21 a.m.  Once Officer Falldorf knew that Defendant was no longer actively engaging him and there was a lull in the action, he activated his body worn camera. Hearing Tr. (6/20/2024) at 10:20 a.m., 10:42 a.m., 11:26 a.m.  Officer Falldorf did not have time to activate his camera while he was engaged in an active gun battle with Defendant; instead, he focused on stopping the threat. Hearing Tr. (6/20/2024) at 10:55 a.m.  As the officers moved toward the vehicle for cover, other patrol vehicles arrived on the scene.  Hearing Tr. (6/20/2024) at 10:24 a.m., 10:41 a.m.

Defendant had crawled by the driver's side of Officer Falldorf and Lee's vehicle, the door of which was still open, and Officer Falldorf could see Defendant's feet "kicking around."  Hearing Tr. (6/20/2024) at 10:24 a.m., 10:42 a.m., 10:54 a.m., 10:56 a.m.  Defendant appeared to go inside the officers' vehicle and then get back out.  Hearing Tr. (6/20/2024) at 10:24 a.m.  Officers started giving Defendant commands to drop the weapon and show his hands, but he failed to respond to any of them; instead, Defendant pointed a cell phone at the officers and was holding it in the way that someone would hold a firearm.  Hearing Tr. (6/20/2024) at 10:24 a.m., 10:47 a.m., 10:55 a.m., 10:56 a.m. – 10:57 a.m., 11:02 a.m., 11:29 a.m., 11:30 a.m.  Defendant was not holding the phone in a manner that someone would hold a phone while taking a picture; rather, his arm was fully extended, like "punching out" a firearm - a position people use for stability when firing a firearm. Hearing Tr. (6/20/2024) at 11:30 a.m. – 11:31 a.m., 11:37 a.m.  Officer Falldorf told other officers that Defendant had a cell phone so that no one would mistake it for a firearm.  Hearing Tr.

4

(6/20/2024) at 10:24 a.m. – 10:25 a.m., 10:58 a.m., 11:30 a.m.  Officers thought that Defendant may have been baiting them into shooting him because it looked like he was holding a firearm when he was actually holding a phone.  Hearing Tr. (6/20/2024) at 11:38 a.m.  During this time, a black bag like the one Officer Falldorf saw in Defendant's hands was on the ground near the patrol vehicle.  Hearing Tr. (6/20/2024) at 10:58 a.m.

Defendant crawled to the front of Officer Falldorf and Officer Lee's patrol vehicle and stood up on the front bumper, before running south into the desert area near the train tracks, away from the officers.  Hearing Tr. (6/20/2024) at 10:25 a.m., 10:47 a.m. – 10:49 a.m.  Defendant went over a fence and was then taken into custody in the desert area.  Hearing Tr. (6/20/2024) at 10:49 a.m., 10:51 a.m., 11:30 a.m.  When Defendant was taken into custody, he was holding his phone toward the officers like it was a firearm.  Hearing Tr. (6/20/2024) at 11:30 a.m.

Officers cleared the two vehicles – the one in which Defendant arrived and Officer Falldorf and Lee's vehicle.  Hearing Tr. (6/20/2024) at 10:26 a.m., 10:31 a.m., 10:50 a.m.  The passenger door of Defendant's vehicle was open, as was the driver's door of the officers' vehicle, and blood was on the ground between the two vehicles.  Hearing Tr. (6/20/2024) at 11:05 a.m.  Officer Falldorf did not find a firearm in Defendant's vehicle, so he initially thought that Defendant could still be armed and radioed that information to the other officers.  Hearing Tr. (6/20/2024) at 10:26 a.m., 11:06 a.m., 11:20 a.m. – 11:22 a.m.  Further, there was no blood or damage to the windshield or any of the windows, but there was a bullet impact in the A pillar.  Hearing Tr. (6/20/2024) at 10:26 a.m. – 10:27 a.m., 10:28 a.m., 10:30 a.m., 11:16 a.m.  A bullet could not strike the A pillar unless the vehicle's door was open.  Hearing Tr. (6/20/2024) at 10:27 a.m.  After checking Defendant's vehicle the first time, Officer Falldorf backed away to regroup behind cover and listen to the police radio, and then checked the car again.  Hearing Tr. (6/20/2024) at 11:22 a.m. – 11:23

5

a.m., 11:34 a.m.  Officer Falldorf then found Defendant's firearm in his patrol vehicle between the seat and the center console, blood on the steering wheel, bullet impacts on the windshield and passenger door, and a shattered front passenger window.  Hearing Tr. (6/20/2024) at 10:28 a.m. – 10:30 a.m., 11:08 a.m., 11:10 a.m.

Certain administrative activities occurred within LVMPD because a police shooting had occurred in this case.  Hearing Tr. (6/20/2024) at 11:11 a.m.  One of the things that happened was that a public safety statement was issued, to inform the public about the shooting and that no further threat existed.  Hearing Tr. (6/20/2024) at 11:11 a.m. – 11:12 a.m.  The public safety statement includes a mandatory statement given by each officer involved in the shooting.  Hearing Tr. (6/20/2024) at 11:12 a.m.  This statement is included in the Force Investigation Team ("FIT") walk-through.  Hearing Tr. (6/20/2024) at 11:12 a.m.  The officers participated in the FIT walk-through to help FIT understand what occurred.  Hearing Tr. (6/20/2024) at 11:17 a.m.

The officers also had to give a mandatory statement about the event to the Critical Incident Review Team ("CIRT"), which reviewed the tactics used as well as the shooting.  Hearing Tr. (6/20/2024) at 11:12 a.m., 11:13 a.m.  After conducting its investigation, CIRT created a PowerPoint regarding the incident and presented it to a panel that included LVMPD personnel, the Tactical Review Board, and civilians.  Hearing Tr. (6/20/2024) at 11:13 a.m.  After reviewing this investigation, the panel voted on whether the policies, procedures, and implementation of them were appropriate during the incident, in order to improve them in the future.  Hearing Tr. (6/20/2024) at 11:13 a.m.

A diagram of the crime scene (Exhibit 8) depicts the position of the officers, Defendant, vehicles, and cartridges found at the crime scene.  Hearing Tr. (6/20/2024) at 11:16 a.m.  Each officer had a 9 mm Luger and Defendant had a Baretta, which was recovered inside the police

vehicle.  Hearing Tr. (6/20/2024) at 11:17 a.m.  According to the crime scene diagram, eight 9 mm Luger cartridges were found at the crime scene and no Baretta cartridges were found.  Hearing Tr. (6/20/2024) at 11:17 a.m.  The FIT report determined that no evidence existed that Defendant fired his weapon that day, which is contrary to Officer Falldorf's recollection of the events that occurred.  Hearing Tr. (6/20/2024) at 11:18 a.m., 11:34 a.m.  Officer Falldorf maintains that Defendant shot his firearm during the incident.  Hearing Tr. (6/20/2024) at 11:15 a.m., 11:18 a.m.  Nonetheless, for use of deadly force purposes, once Defendant pointed his firearm at officers, it did not matter whether he pulled the trigger.  Hearing Tr. (6/20/2024) at 11:38 a.m.  No law or policy requires officers to wait to fire to be shot when a gun is pointed at them in order to fire their own weapons.  Hearing Tr. (6/20/2024) at 11:39 a.m.  Here, Defendant pointed his gun at Officer Falldorf before the officer even had his own gun out of its holster.  Hearing Tr. (6/20/2024) at 11:39 a.m.

Officer Falldorf testified that deadly force was required during this incident because Defendant pointed a firearm at the officers.  Hearing Tr. (6/20/2024) at 11:14 a.m.  Officer Falldorf further testified that the officers had no option other than to use deadly force due to Defendant's actions and that there was no other way to prevent Defendant from shooting either of the officers.  Hearing Tr. (6/20/2024) at 11:14 a.m.

### B.  Testimony of Officer Lee

On January 12, 2022, LVMPD Police Officer Dominic Lee was on duty as a flex officer in South Central Area Command with his partner Officer Falldorf.  Hearing Tr. (6/20/2024) at 11:43 a.m.  Officer Lee was a police officer in North Carolina before he moved to Las Vegas; therefore, he has been through two police academies. Hearing Tr. (6/20/2024) at 11:43 a.m.  Officer Lee is also a firearms instructor.  Hearing Tr. (6/20/2024) at 11:43 a.m.

On January 12, 2022, Officers Lee and Falldorf had just finished a call and stopped at the gas station to fill up and clean their patrol vehicle before the end of their 10-hour shift. Hearing Tr. (6/20/2024) at 11:44 a.m., 12:11 p.m. Dispatch did not know that the officers were at the gas station at that point because Officer Lee mistakenly forgot to clear their final call. Hearing Tr. (6/20/2024) at 12:12 p.m. – 12:13 p.m. When CIRT reviewed the officer-involved shooting in this incident, they also reviewed the failure to clear. Officer Lee was not disciplined but was told to make sure he clears the calls in the future. Hearing Tr. (6/20/2024) at 12:13 p.m.

After Officer Lee got back into his vehicle at the gas station, he saw a vehicle drive quickly into the gas station and come to an abrupt stop near the officers' vehicle. Hearing Tr. (6/20/2024) at 11:47 a.m., 12:13 p.m. Officer Lee heard the gears of the vehicle grind to a halt. Hearing Tr. (6/20/2024) at 12:14 p.m. The female driver abruptly jumped out of her vehicle and Officer Lee noticed that her face was pale, her eyes looked like saucers, and she mouthed, "Help me." Hearing Tr. (6/20/2024) at 11:48 a.m., 12:18 p.m. When Officer Lee opened the door to his vehicle, he heard the female say, "I need help." Hearing Tr. (6/20/2024) at 11:48 a.m., 11:58 a.m., 12:18 p.m. Officer Lee thought the woman looked terrified. Hearing Tr. (6/20/2024) at 12:18 p.m. Since Officer Lee could tell this was a serious situation, he drew his weapon and held it down at his side while he scanned the female for weapons. Hearing Tr. (6/20/2024) at 11:49 a.m., 12:18 p.m. – 12:20 p.m. Once he determined the female was not a threat, he turned to look toward the other vehicle and saw his partner near the vehicle. Hearing Tr. (6/20/2024) at 11:49 a.m. – 11:50 a.m. Officer Lee also saw Defendant sitting in the vehicle - Defendant reached into a black bag, drew out a firearm, and pointed it at Officer Lee. Hearing Tr. (6/20/2024) at 11:50 a.m., 12:22 p.m., 12:44 p.m. Simultaneously, Officer Falldorf yelled out, "Gun!" Hearing Tr. (6/20/2024) at 11:50

a.m. – 11:51 a.m., 12:44 p.m.   Both Officer Lee and the female ducked behind his patrol vehicle. Hearing Tr. (6/20/2024) at 11:50 a.m., 11:59 a.m., 12:24 p.m.

Officer Lee had a clear view of Defendant's weapon and could tell with certainty based on his experience that it was a firearm; specifically, a black Baretta.  Hearing Tr. (6/20/2024) at 11:56 a.m., 12:22 p.m. – 12:24 p.m.  Officer Lee is familiar with Barettas from his use of them as his issued firearms in the military and his experience as a firearms instructor.  Hearing Tr. (6/20/2024) at 11:56 a.m.  He thinks that they are terrible firearms and does not like them because they jam easily, rust, and discharge very easily, causing negligent discharges.  Hearing Tr. (6/20/2024) at 11:56 a.m. – 11:57 a.m.  Specifically, the Baretta is known for firing when the user does not want it to fire and for not firing when the user wants it to fire.  Hearing Tr. (6/20/2024) at 11:57 a.m.

After Defendant pointed his firearm at Officer Lee, Officer Lee shot his weapon toward Defendant without making any commands.  Hearing Tr. (6/20/2024) at 11:51 a.m., 12:00 p.m., 12:27 p.m. – 12:28 p.m.  Officer Lee also motioned for the female to get back because he was worried for her safety.  Hearing Tr. (6/20/2024) at 12:00 p.m.  Officer Lee believed that Defendant also shot his weapon because he heard a loud bang and saw a flash in the window.  Hearing Tr. (6/20/2024) at 11:52 a.m.  As Defendant was exiting his vehicle, he was rapidly moving his firearm between the officers and punching his arm out toward Officer Lee with the firearm in it.  Hearing Tr. (6/20/2024) at 11:54 a.m. – 11:55 a.m., 12:01 p.m., 12:30 p.m.  Since Officer Lee saw that Defendant was still pointing his firearm at both officers, he fired again.  Hearing Tr. (6/20/2024) at 11:54 a.m., 12:01 p.m., 12:29 p.m.  At this point, Officer Lee could not see Officer Falldorf and had not heard from him, so he thought that Defendant had shot him.  Hearing Tr. (6/20/2024) at 12:02 p.m.

Officer Lee stated over the radio that shots had been fired to let other officers know the situation and that he had fired his weapon. Hearing Tr. (6/20/2024) at 12:03 p.m. Officer Lee saw Defendant climb into the patrol vehicle and stated over the radio that he had done so – he thought that Defendant might be driving away in the patrol vehicle or using some of the weapons that were in the patrol vehicle. Hearing Tr. (6/20/2024) at 12:02 p.m., 12:03 p.m. – 12:04 p.m. Officers have rifles, shotguns, and spray in the vehicle that Defendant could use to cause damage. Officer Lee saw Defendant climb into the patrol vehicle. Hearing Tr. (6/20/2024) at 12:04 p.m. Officer Lee moved behind another set of gas pumps. Hearing Tr. (6/20/2024) at 12:05 p.m. He and Officer Falldorf separated into a tactical L so that they could each get a different view and maintain cover and so that, if they had to fire again, it was less likely they would hit each other. Hearing Tr. (6/20/2024) at 12:05 p.m. – 12:06 p.m. Officer Lee could now see Defendant from under the patrol vehicle, moving around, climbing in and out of the vehicle, and Defendant continued to fail to comply with any of the officers' commands. Hearing Tr. (6/20/2024) at 12:06 p.m. – 12:07 p.m. As Officers Lee and Falldorf met up together, other officers began to arrive on the scene. Hearing Tr. (6/20/2024) at 12:08 p.m. Defendant had his back to the officers and turned and motioned back toward them and extended his arm out as if he was going to shoot at them, causing Officer Lee to fire another round. Hearing Tr. (6/20/2024) at 12:09 p.m. Officer Lee shot his firearm a total of seven times and Officer Falldorf shot his firearm a total of two times. Hearing Tr. (6/20/2024) at 12:33 p.m.

The FIT investigation did not find any spent shell casings from Defendant's weapon, but it did find a bullet that had been ejected from his weapon on the floorboard in the passenger side of his vehicle. Hearing Tr. (6/20/2024) at 11:53 a.m., 12:32 p.m., 12:40 p.m. Officer Lee knows that a person must pull the slide of the weapon back for a bullet to eject from the firearm. Hearing

Tr. (6/20/2024) at 11:53 a.m.  The reason a person pulls the slide of a firearm back is to put a fresh bullet into the chamber in order to fire it.  Hearing Tr. (6/20/2024) at 11:54 a.m.  The FIT investigation also failed to find one of the shell casings shot by Officer Lee.  Hearing Tr. (6/20/2024) at 12:32 p.m.

The reason that Officer Lee used deadly force is that Defendant pointed his firearm at Officer Lee and his partner, Officer Falldorf.  Hearing Tr. (6/20/2024) at 12:10 p.m., 12:34 p.m.  For use of force purposes, it does not matter if Defendant pointed his gun at officers or fired at them.  Hearing Tr. (6/20/2024) at 11:59 a.m.  It takes a split second for a bullet to travel from a firearm into someone's body and, therefore, officers must act when a firearm is pointed at them.  Hearing Tr. (6/20/2024) at 11:59 a.m.  Considering the time that Officer Lee had in this instance, he had no choice but to discharge his weapon.  Hearing Tr. (6/20/2024) at 11:59 a.m. – 12:00 p.m., 12:10 p.m.

## II.   ANALYSIS

### A.   Credibility of Witnesses

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw.  "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes.   Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).  "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted).  *See also United States v. Howell*, 231 F.3d 615, 621

(9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility. Having done so, the Court finds that both Officer Falldorf and Officer Lee testified credibly.

### B.     Motion to Suppress

Defendant asks the Court to suppress the firearm that was seized after he was shot. Docket No. 39. Specifically, Defendant submits that shooting him constituted a seizure for which the officers needed probable cause that they did not have. *Id.* at 2, 6. Defendant submits that he asked his ex-girlfriend to take him to the hospital due to an infection in his legs and that, on the way to the hospital, they instead decided to go to the bus station so that he could leave Las Vegas. *Id.* at 2. Defendant further submits that the two stopped at the gas station to get gas and that, after his ex-girlfriend exited the vehicle, he "went through his bag" that contained his belongings. *Id.* at 2-2. While doing so, Defendant submits, glass exploded all around him as something hit the windshield of his car, hot pressure hit the side of his face, and he realized that his windshield had been repeatedly hit by bullets. *Id.* at 3. Defendant submits that he panicked and got out of the car, after which he only remembers wanting to get away. *Id.* Defendant further submits that, though officers claim he shot at them, he did not, and the officers shot him multiple times, causing him to collapse between his vehicle and the patrol car. *Id.* at 3-4. Defendant submits that he ran away from the bullets, hopped a wall, and ran toward the train tracks until he collapsed and was arrested.

12

*Id*. at 4-5. Defendant further submits that a firearm was found in the patrol car. *Id*. at 5. Defendant submits that, since the shooting was a seizure for which the officers did not have probable cause, the firearm was improperly recovered. *Id*. at 6. Therefore, Defendant asks the Court to suppress the firearm. *Id*.

In response, the United States submits that Defendant lacks standing to challenge the seizure of the firearm. Docket No. 47. Specifically, the United States submits that the officers had probable cause to believe Defendant posed a threat of serious physical harm based on the female driver's actions and demeanor and the fact that both officers saw a gun in Defendant's hand. *Id*. at 10. The United States submits that both officers believed that they and the female driver were in mortal danger and that mistakenly believing Defendant fired at them is of "no practical or legal import." *Id*. The United States submits that Defendant failed to comply with the officers' commands and instead crawled into the patrol car, left his gun there, and then fled. *Id*. The United States further submits that Defendant abandoned his gun prior to submitting to police authority and, therefore, he has no standing to challenge the recovery of the weapon. *Id*. at 11. Finally, the United States submits that, since Defendant had not submitted to authority at the time he discarded his firearm in the patrol vehicle, the firearm was not the fruit of a seizure at all and, therefore, the United States asks the Court to deny his motion to suppress. *Id*.

In reply, Defendant argues against the government's characterization of the events at issue. *See* Docket No. 50. Defendant further re-submits that the police illegally seized him because they shot him without probable cause and that he did not voluntarily abandon the firearm. *Id*. at 5-9.

### 1. Seizure

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Torres v. Madrid*, 592

U.S. 306, 311 (2021). The first step in the Fourth Amendment analysis is determining whether a seizure occurred. A seizure "requires either physical force ... or, where that is absent, submission to the assertion of authority." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). A "show of authority, such as an order for a suspect to halt[,] ... does not become [a seizure] unless and until the arrestee complies with the demand." *Torres*, 592 U.S. at 311. In contrast, "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Id.* at 325. Determining whether a seizure occurred, however, is "just the first step in the analysis." *Id.* "The Fourth Amendment does not forbid all or even most seizures—only unreasonable ones." *Id.* After determining whether a seizure occurred, courts must then analyze whether the force used to accomplish the seizure was reasonable. *Id.*

The appropriate inquiry is "whether the challenged conduct *objectively* manifests an intent to restrain, for [the Court] rarely probe[s] the subjective motivations of police officers in the Fourth Amendment context." *Id.* at 317 (quoting *Nieves* v. *Bartlett*, 139 S.Ct. 1715, 1724-25 (2019)). Only an objective test "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Torres*, 592 U.S. at 317 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)). Further, the reasonableness of the seizure does not depend on the subjective perceptions of the seized person. *Torres*, 592 U.S. at 317.

Here, the use of force when the officers shot at Defendant constituted a seizure under *Torres*. As a result, the Court must now determine whether that use of force was excessive. *Torres*, 592 U.S. at 325. The Supreme Court has stated that the "calculus of reasonableness" in these circumstances "must embody allowance for the fact that police officers are often forced to make split-second judgments" and courts do not apply the "20/20 vision of hindsight." *Graham v.*

*Connor*, 490 U.S. 386, 396-397 (1989).  The Ninth Circuit has found that, when a suspect points a gun in an officer's direction, "the Constitution undoubtedly entitles the officer to respond with deadly force." *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023), *cert. denied,* 144 S. Ct. 559, 217 L. Ed. 2d 297 (2024) (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)); *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (officers' use of lethal force was not excessive when the suspect held a "long gun and pointed it at them").  Other courts have also held that an officer's use of deadly force is objectively reasonable against armed suspects who point their gun toward officers.  *See Smith v. Kilgore*, 926 F.3d 479, 486 (8th Cir. 2019) (objectively reasonable for officers to use deadly force against armed suspect who shot at one officer and pointed his gun at another officer); *Partlow v. Stadler*, 774 F.3d 497, 502–03 (8th Cir. 2014) (officer's use of deadly force objectively reasonable against armed suspect who refused commands to drop the gun and moved his shotgun in a way leading officers to believe he was aiming at them); *Aipperspach v. McInerney*, 766 F.3d 803, 806–07 (8th Cir. 2014) (officers' use of deadly force objectively reasonable against armed suspect who refused repeated commands to drop the gun, pointed it once at sergeant, and then waved it in direction of officers).

Here, Defendant pointed a gun at both officers and refused repeated commands to drop the weapon and to show his hands.  Both officers believed at the time that Defendant shot his gun at them and, although the FIT investigation tends to demonstrate that he did not shoot at them, pointing his gun at them is enough to give them probable cause to believe that Defendant "posed a significant threat of death or serious physical injury" to them.  *Est. of Strickland*, 69 F.4th at 621-622.  The Ninth Circuit has clearly found that, "when a suspect points a gun in the direction of officers, they would be justified to use deadly force." *Id*. at 622.  Therefore, the Court finds that

Officers Falldorf and Lee were justified in using deadly force during this incident and that the seizure was reasonable.

The Supreme Court specifically stated that the rule in *Torres* "is narrow. In addition to the requirement of intent to restrain, a seizure by force—absent submission—lasts only as long as the application of force." *Torres*, 592 U.S. at 318. The Fourth Amendment does not recognize any "*continuing* arrest during the period of fugitivity." *Hodari D.*, 499 U.S. at 625. "The fleeting nature of some seizures by force undoubtedly may inform … what evidence a criminal defendant may exclude from trial." *Id*. Therefore, in this case, the seizure of Defendant lasted only while the shooting occurred. In between the rounds of shooting, Defendant climbed into the patrol car and stashed his firearm. Further, after the shooting ended, Defendant got up, stood on the bumper of the patrol car, ran to a fence, hopped over the fence, and ran away toward the train tracks. Under *Hodari D.* and *Torres*, the seizure clearly ended when Defendant got up and began running away.[3]

### 2. Standing

To have Fourth Amendment "standing" to "contest the legality of a search or seizure, the defendant must establish that he had a 'legitimate expectation of privacy' in the place searched or in the property seized." *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986) (emphasis added) (citation omitted). Defendant has the burden of establishing standing, not the United States. *United States v. Singleton*, 987 F.2d 1444, 1449 (9th Cir. 1993) (defendant's burden of proof as established by the Supreme Court); *United States v. Hull*, 2022 WL 2921000, at *2 (E.D. Wash. July 25, 2022).

---

[3] Because *Torres* and *Hodari D.* clearly hold that a seizure only occurs during the use of force, it is most likely that no seizure was occurring during the break in shooting when Defendant climbed into the patrol car and stashed his weapon. As the Court finds that the seizure was reasonable, however, the Court need not make this determination.

It is well settled that a "defendant who abandons property has no standing to contest its search and seizure." United States v. Stephens, 206 F.3d 914, 917 (9th Cir. 2000). *See also United States v. Gilman*, 684 F.2d 616, 619 (9th Cir. 1982) ("(i)f a person has voluntarily abandoned property, he has no standing to complain of its search or seizure"). Whether a defendant abandons property is a question of fact; a court must examine the totality of circumstances, including whether the defendant denied ownership of the property. *United States v. Gonzalez*, 979 F.2d 711, 714 (9th Cir. 1992). Abandonment is determined "by measuring the intent of a party in objective terms." *Gilman*, 684 F.3d at 619. It may "be inferred from words, acts and other objective facts ... (that) the person ... relinquished ... a reasonable expectation of privacy in his property." *United States v. Jackson*, 544 F.2d at 409; United States v. Sledge, 650 F.2d 1075, 1077 (9th Cir. 1981).

Here, the totality of the circumstances clearly demonstrate that Defendant intended to abandon his firearm. He climbed into the patrol vehicle, put his firearm in the patrol vehicle, and then left the patrol vehicle without ever attempting to reenter the vehicle. Defendant then fled the area, leaving his property in the officers' vehicle. Defendant's actions clearly demonstrate that he abandoned the firearm; therefore, he has no standing to contest the legality of the seizure of the firearm. In any event, however, the Court has already found that the officers' seizure of Defendant by using deadly force was reasonable; therefore, Defendant's request to suppress the firearm due to an unreasonable seizure would be properly denied even if Defendant had standing to contest the recovery of the firearm.

. . . .

. . . .

. . . .

. . . .

17

## III.   RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant's motion to suppress evidence, Docket No. 39, be **DENIED**.

DATED: July 12, 2024.

NANCY J. KOPPE
UNITED STATES MAGISTRATE JUDGE

## NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).   A party who objects to this report and recommendation must file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

18